UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LINDA E. HOUSHOLDER,
            Plaintiff,

                                                    No. 1:08-cv-937
-v-
                                                    HONORABLE PAUL L. MALONEY
HASTINGS MUTUAL INSURANCE COMPANY,
            Defendant.


OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

        Plaintiff Linda Housholder (Plaintiff) worked as a claims representative for Defendant

Hastings Mutual Insurance Company (Defendant) from March 14, 2005 to October 1, 2007, when

she was terminated.  Plaintiff filed a lawsuit on October 6, 2008 alleging a violation of the Family

and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*  Defendant filed a motion for summary

judgment.  (Dkt. No. 37.)  Defendant asserts Plaintiff cannot establish a claim under the FMLA

because she has no direct evidence of retaliation, no circumstantial evidence of retaliation, and

cannot establish that the legitimate reasons for her termination were pretextual.  Defendant further

asserts Plaintiff committed resume fraud and would not be entitled to either damages or

reinstatement under the after-acquired evidence doctrine.  Plaintiff filed a response.  (Dkt. No. 46.)

Defendant filed a reply (Dkt. No. 47) and a memorandum of supplemental authority (Dkt. No. 50).

The court has had the benefit of oral argument on the motion.

I.  LEGAL FRAMEWORK

        Summary judgment is appropriate only if the pleadings, depositions, answers to

interrogatories and admissions, together with the affidavits, show there is no genuine issue of

material fact and that the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P.

56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## II. FACTUAL BACKGROUND

Defendant Hastings Mutual hired Plaintiff as a senior claims representative in the workers' compensation group in March 2005. (Pl. Ex. 1 - Housholder Dep., 43.) The job description for a senior claims representative identifies, as the first of eight principals of accountability ("First Principal"), the need to "[f]acilitate the claim process and resolve claims in a timely manner by initiating and maintaining positive and productive communications with all customers." (Def. Ex. 9 - Job Description.) Plaintiff testified that Defendant considered the term "customer" broadly to include not just the insured, but plaintiffs' attorneys, claimants, and even medical providers. (Def. Ex. 1 - Housholder Dep. 76.)

Peggy Surma, Plaintiff's supervisor when she began working, first documented customer complaints about Plaintiff in June 2005. Surma met with Plaintiff on June 14, 2005 to discuss two

calls from customers requesting a different claim handler.  (Pl. Ex. 12A.)  Surma emphasized that "[c]ustomer service is a priority here at Hastings."  (*Id.*)  Surma wrote she had "received several complaints," but "together we must try to keep these calls to a minimum."  (*Id.*)  Surma emailed a summary of the meeting to Julie Hutchins, the supervisor of human resources.  (*Id.*)

During her employment, Plaintiff received several performance evaluations.  Five months after she began working for Defendant, on August 11, 2005, Plaintiff received a progress review.  (Pl. Ex. 1.)  Surma appreciated the thoroughness of Plaintiff's investigation of the assigned claims.  (*Id.*)  The review does not contain negative criticism of Plaintiff's work.  (*Id.*)

Plaintiff received a formal Performance Review and Development (PRD) at the end of her first year.  (Def. Ex. 2 - PRD 2006.)  On a five point scale, Plaintiff received something just above the middle rating.[1]  (*Id.*, 7.)  Plaintiff was rated "FS" for her performance related to the First Principal.  (*Id.*, 2.)  She is described as "successfully meeting service standards of contacting claimants on a timely basis" and as having "good relationships" with Defendant's attorneys.  (*Id.*)  Under the space for additional comments, Plaintiff is described as "knowledgeable in coverage and case law," and "an asset to the Work Comp Unit."  (*Id.*, 7.)  However, she also holds viewpoints that are "black or white, which at times can lead to difficult communications between her customers, but

---

[1]

The best rating is "outstanding" (OS)", the middle rating is "fully successful" (FS), and the lowest rating is "needs much improvement" (NMI).  Plaintiff received a rating of "FS+."  "Fully successful" is defined in the document.

> Performance fully meets what is expected from a person performing the documented functions for all top priority/weighted and most lower priority/weighted responsibilities.  All skill requirements of the process have been fully met.  Employees at this level display proficiency in the priority/weighted aspects of the job, both in results achieved and in work-related behavior.  This rating shows mastery of the job in some areas as well as opportunities for development in others.

(PRD 2006, 2.)

her excellent knowledge of the Act is her main guidance through these times." (*Id.*)

Beginning in July 2006, the documented problems with Plaintiff began to escalate.[2] On July 28, 2006, Surma sent an email to Plaintiff asking her to place a priority on a particular claim. (Pl. Ex. 12G - a.m. email.) Plaintiff and Surma responded back and forth numerous times over 20 minutes. (*Id.*) At one point, Surma writes "[a]lmost daily I receive phone calls about your claims, and if I am receiving them, so are others." (*Id.*) Surma's last response states she will no longer go back and forth on the topic and ask Plaintiff to please get back to work. (*Id.*) Surma and Plaintiff had two conversations later that day during which appropriate customer service was discussed. (Pl. Ex. 12H - p.m. email.) Ms. Surma stated she "receive[d] calls frequently about [Plaintiff's] service and tone in conversation." (*Id.*)

Defendant submitted emails regarding a number of customer complaints that occurred during August. During the first week of August, Surma emailed Plaintiff about complaints she had received from an insurance agent. (Pl. Ex. 12I.) The agent received complaints from an insured, who was concerned about the customer service he was receiving on claims handled by Plaintiff. (*Id.*) The insured was considering moving all lines of his business elsewhere. (*Id.*) On August 8, 2006, Surma received a complaint regarding Plaintiff from an individual who had a claim against an insured. (Pl. Ex. 12J.) Surma stated the claimant alleged Plaintiff made her feel "like crap" during an interview and the claimant described the conversation with Plaintiff as "horrendous," using the words "grilled" and "so rude." (*Id.*) Plaintiff responded to the email stating she was "surprised to hear that clmt was so upset over the statement." (*Id.*) Finally, on August 17, 2006, Surma documented a call from a

---

[2]

The record does not reveal whether the problems began to escalate in June 2006 or if the documentation of problems began to increase in June 2006.

plaintiff's attorney, who was complaining about the way a claim was being handled by Plaintiff. (Pl. Ex. 12K.) The attorney "stated [Plaintiff] had been unpleasant to deal with, displayed an unfriendly attitude, [and stated] if she was his employee, she would not have a job." (*Id.*) Surma had a meeting with Plaintiff later that day to discuss the claim. (*Id.*) According to Surma, Plaintiff was "defensive in her attitude," and "left my desk angry at my decision." (*Id.*)

In October 2006, Plaintiff had a mid-year performance review. In the review, Surma reiterated that customer service was the First Principal. (Pl. Ex. 8.) Surma acknowledged that the types of claims handled within the unit can be confrontational, due to the types of losses handled. (*Id.*) Surma stated the number of complaint calls during the previous six months for claims handled by Plaintiff had increased. (*Id.*) If improvement was not demonstrated over the next six months, Plaintiff would not be fully successful in the First Principal. (*Id.*) "If immediate and continuous improvement is not achieved, a formal Performance Improvement Plan will be implemented (job jeopardy)." (*Id.*) Plaintiff was required to take two in-house seminars in order to improve her communication effectiveness. (*Id.*)

Plaintiff's second annual PRD was prepared on February 28, 2007. (Def. Ex. 5 - PRD 2007.) Plaintiff received an overall rating of "FS." (*Id.*) The PRD reports Plaintiff completed her required in-house courses on improving her communication skills. (*Id.*) Under the discussion of the First Principal, the PRD noted problems earlier in the year and the mid-year review. The PRD then stated "[s]ince then, improvements have been made, although continual monitoring will be necessary. The audit of claim files reflected improvements [in] initial claim contact, however, review of claim files and inter-unit telephone calls indicate service complaints continue." (*Id.*) Plaintiff received an "FS-" rating for the First Principal. (*Id.*)

Plaintiff began to miss work early in 2007. Beginning on Wednesday, February 7, through Friday, February 9, Plaintiff was hospitalized for a blocked biliary duct. (Def. Ex. 28 - Housholder Affidavit ¶ 2.) Plaintiff had surgery. (Def. Ex. 29 - Housholder Dep., 26.) She worked Tuesday, February 13 and Wednesday, February 14, but was too sick to work on Thursday, Friday, and the following Monday. (Pl. Affidavit ¶ 2.) Plaintiff worked Tuesday and Wednesday, February 20 and 21. (*Id.*) Plaintiff did not work from Thursday, February 22 to March 25, 2007. (*Id.*) Plaintiff did not work on May 1 or May 2, 2007, because she had surgery to remove the stent that was placed during the first surgery. (*Id.* ¶ 3.) Only thirteen days between February 22 through March 25 were considered FMLA time. (*Id.* ¶ 4.)

On May 14, 2007, a customer called to complain about a problem with a bill. Plaintiff was working from home that day.[3] (Def. Ex. 14.) Plaintiff and Surma exchanged emails about the complaint for about one hour. (Pl. Ex. 12S.) Plaintiff believed she and Surma were having communication problems and suggested they get the human resources department involved. (*Id.*) Surma emailed Hutchins, informing her that Plaintiff would be calling to set up a meeting. (Def. Ex. 14.) Surma described the basis for the meeting as a customer complaint and stated that although Plaintiff has shown some improvement, "complaint calls continue on her claims; a higher volume than anyone else in the Unit." (*Id.*)

The meeting with Plaintiff, Hutchins and Surma occurred on May 24, 2007. Before the meeting, either Surma or Hutchins prepared an outline of topics to cover and action to be taken. (Def. Ex. 15.) Plaintiff's ability to work from home was revoked. (Housholder Dep., 215.) The meeting lasted between five and ten minutes. (*Id.*, 220.) After the meeting, Plaintiff sought Dana

---

[3] When Plaintiff began working for Hastings, she arranged to work from home twice a week.

Walters, vice president of human resources, and expressed her dissatisfaction with the meeting. (*Id.*) Plaintiff felt Surma was picking on her (*Id.*) and was concerned that the customer complaints were being placed in her performance review (*Id.*, 107). Plaintiff explained she was being accused of getting behind in her work which piled up while she was sick and out of the office. (*Id.*, 108-109.)

Walters, Surma and Plaintiff had a meeting. (Housholder Dep., 222.) Surma was told to verify complaints before including them in Plaintiff's performance reviews. (*Id.*) Surma restored Plaintiff's remote work privileges some seven or eight weeks after they had been taken away. (*Id.*, 223.) Plaintiff was asked to take a personality profile. (*Id.*, 224.) The profile revealed Plaintiff had good empathy, good social abilities, was confident, smart and willing to take risks. (Def. Ex. 3 - Walters Dep., 29; Pl. Ex. 16 - Walters notes.) The profile also revealed Plaintiff believed she is right most of the time and needed to work on understanding her boss. (Walter Dep., 29; Walter notes.) Plaintiff also was persistent with her own point of view and had trouble seeing the other side. (Walters Dep., 30; Walters notes.) Plaintiff, Surma and Walters had a follow up meeting, where several classes were recommended for Plaintiff to take. (Walter Dep., 33.)

Plaintiff began to miss work for health reasons in mid-August 2007. (Housholder Dep., 62-63.) Plaintiff experienced joint pains and spasms, which were ultimately diagnosed as myofacial pain syndrome. (Housholder Affidavit ¶ 5.) Plaintiff missed work during the latter half of August and the first part of September due to her pain. She petitioned for an "Intermittent Leave of Absence" under the FMLA for her serious medical condition. On September 20, 2007, Plaintiff was granted FMLA leave for her time off of work between August 31 through September 7, 2007. (Pl. Ex. 12.) She was also approved for additional time off for problems related to her condition and Plaintiff was given the responsibility to inform others of any absences related to her condition for

the absence to be counted as FMLA leave.  (*Id.*)

About the same time, Bob Dykstra became the supervisor for the workers' compensation adjusters.  Dkystra reported to Surma, who managed both the workers' compensation unit and the person protection insurance group.  (Housholder Dep., 62-63.)  On August 28, 2007, Dykstra emailed Surma advising her that Plaintiff had called in sick and would only be at work for a half day the next day.  (Pl. Ex. 10; Def. Ex. 17.)  Dykstra commented "her attendance is negatively affecting her case load and our ability to deliver quality customer service."  (*Id.*)  He noted he was "unable to keep her in the rotation for new claims; she has 111 overdue activities in ClaimCenter."  (*Id.*)  Surma responded by email with the following:

> Bob, my records indicate she had missed 54.25 hours in addition to the 186 hours used for FMLA.  If she does not have a medical condition applicable to FMLA, it is time to discuss her attendance.  We may want to suggest EAP.  Please contact Julie Hutchins to discuss initiation of PIP, Performance Improvement.

(*Id.*)

Plaintiff returned to work on September 10.  On September 12 she was called to a meeting with Dykstra and Surma.  (Pl. Ex. 13; Def. Ex. 20.)  Four topics were covered in the meeting.  (*Id.*)  Under "dependability," Dykstra commented that Plaintiff had missed 11.6 days for sick time up to that point in the year, which he considered excessive.[4]  (*Id.*)  The other three topics were

---

[4]

The parties dispute how much non-FMLA leave Plaintiff used.  *Compare* Def. Ex. 18 *with* Pl. Ex. 14.  This dispute is not material to the issues raised.  Plaintiff asserts she "did not understand the significance of whether the days were counted as sick days or FMLA days because Hastings has a liberal sick leave policy and I was never warned of any concern by my employer over my absences until September 12, 2007."  (Housholder Affidavit ¶ 6.)  Plaintiff's assertion that Defendant was concerned about her absences is a correct, but an incomplete, statement.  In the meeting, Dykstra discussed a number of other issues not related to absences.  The reason Dykstra gave for eliminating her ability to work from home was because of his "desire to evaluate and train the WC staff from the perspective of a level playing field" and "to have access to each on the same regular and consistent schedule."  (Def. Ex. 21.)

"productivity," "participation," and "direct communication." (*Id.*) Plaintiff's ability to work from home was revoked for the second time. (*Id.*) Dykstra emailed his summary of the meeting to Surma, Hutchins, Walters, and Chris Ballantyne, the claims vice president. (Def. Ex. 21.) Dykstra offered a justification for the meeting.

> A meeting was held on the 12th to review the WC Supervisor's expectations and plan going forward. These objectives have been repeatedly shared in day to day interaction with my staff since the 16th of August. Because of Linda's vacation days, sick days, remote access and FMLA leave since 8/16/07 we thought it would be prudent to review the expectations as well as our plan going forward with her personally and formally in a meeting forum upon her return.

(*Id.*) Two days later, Plaintiff spoke with Ballantyne about restoring her remote work privileges. (Housholder Dep., 248.) Ballantyne explained the reason her ability to work from home had been revoked was related to her work performance. (*Id.*) Plaintiff "was shocked" because "that was never mentioned to me." (*Id.*) According to Plaintiff, Ballantyne agreed the document Dykstra had prepared was "confusing" and that he would have Dykstra rewrite the document so that it was "more concise." (*Id.*, 248-249.)

On September 24, 2007, Plaintiff emailed Dykstra. (Pl. Ex. 15.) Plaintiff explained that it was her understanding the document prepared on September 12 would be rewritten and she wanted to know when the revisions would be completed. (*Id.*) Plaintiff explained she was taking the matter seriously because it was affecting her ability to work from home. (*Id.*) Plaintiff wanted to avoid making further mistakes and sought a method to correct those mistakes. (*Id.*) Dykstra replied to her email at 3:40 p.m. indicating that he would be preparing Plaintiff's mid-year review soon and that "once completed, we'll review." (*Id.*) As she was leaving the office, Plaintiff approached Dykstra's desk and asked when he would be getting to her mid-year review. (Housholder Dep., 249.) According to Plaintiff, Dykstra raised his voice and alleged that her email was sarcastic. (*Id.*, 249,

280.)  The exchange was loud enough for others to hear and Ballantyne came out of his office to tell

the two to take the conversation to a conference room.  (*Id.*, 281; Def. Ex. 5 - Ballantyne Dep., 8.)

The next morning, on September 25, Ballantyne called a meeting with Plaintiff, Surma, and

Dykstra.  Ballentyne limited the content of the meeting.  He informed Plaintiff the meeting was not

a conversation.  (Def. Ex. 23 - Transcript.)  Instead, the meeting was time for Plaintiff to hear what

he, Mr. Ballentyne, had to say.  (*Id.*)  After the meeting, Ballantyne drafted an email memorializing

the genesis of the meeting and the contents of the meeting and copied everyone involved.[5]  (Pl. Ex.

16; Def. Ex. 22.)  A portion of the email is included here.

> I asked for us to meet after overhearing and observing a conversation between Bob
> Dykstra and you yesterday on the open floor.  This followed an email from you to
> Bob requesting the status of your PRD discussion.  While that in and of itself was
> fine, the tone of the discussion as well as the tone of the email caused me to believe
> that you are still not hearing and receiving the feedback you have been given to date.
> My feedback to you:
> - Your behavior and actions are not acceptable and are beginning to
>   become a disruption to the larger organization
> - Your work product is not acceptable.
> - Your service to our customers is not acceptable.
> - Your behavior is not acceptable.
>
> This is the perception of:
> - Your Supervisor
> - Your Manager
> - Myself
> - Human Resources

(*Id.*)  After Ballentyne sent the email, Walters sought him out.  (Walters Dep., 13.)  Walters

testified she and Ballentyne agreed later that day that Plaintiff would be terminated.  She explained

the behavior Plaintiff exhibited in the meeting, combined with Plaintiff's behavior over the previous

---

[5]

A mostly complete transcript of the meeting is attached to Defendant's brief as Exhibit 23.  Plaintiff
states she was in the habit of carrying around a digital recording device at work.  (Housholder Dep.,
308-309.)  She had the device with her and recorded the meeting, without the knowledge of the other
people at the meeting.  (*Id.*, 312.)

few months, demonstrated she was disruptive and difficult to manage.  (*Id.*)  The two agreed Plaintiff would not listen or accept feedback, she was always argumentative, and nothing seemed to work to get Plaintiff to alter her behavior.  (*Id.*, 13-14.)  Ballentyne testified he had not made the decision to terminate Plaintiff before or during the meeting earlier that day.   (Ballentyne Dep., 10.)  After he spoke with Walters he learned about other problems relating to Plaintiff's poor customer service record.  (*Id.*., 11.)  Ballentyne and Walters decided to terminate Plaintiff after his discussion with Walters.  (*Id.*)

Plaintiff left the office after the meeting on September 25 at 8:33 a.m., telling Dykstra she was taking a FMLA day.  (Pl. Ex. 21.)  At 10:00 a.m. Surma emailed Hutchins, Walters and Ballentyne to inform them that Plaintiff had left the building after the meeting.  No reference to FMLA is contained in the email.  (Pl. Ex. 20.)  Plaintiff took both September 26 and 27 as FMLA days and took Friday, September 28 off as a vacation day, so she could get some medical tests done.  (*Id.*; Pl. Ex. 23.)  Ballentyne was forwarded an email on September 27 indicating Plaintiff was taking days under the FMLA.  (Pl. Ex. 23.)  When asked whether he was advised that Plaintiff took FMLA leave on September 25, 26 and 27, Ballentyne admitted he had "seen the emails on which I was cc'ed, but I can't recall if I remembered it at the time, or thought of it, or was aware of it at the time."  (Ballentyne Dep., 14.)

Plaintiff returned to work on Monday, October 1, 2007.  Around 8:20 a.m., Dykstra took Plaintiff to a meeting room where they were joined by Surma and  Hutchins.  (Housholder Dep., 295-296; Pl. Ex. 19.)  According to Plaintiff, Dykstra stated her disruptive behavior would no longer be tolerated and that she was terminated.  (Housholder Dep., 296.)  The notes of the meeting prepared by Hutchins indicate Dykstra discussed the work atmosphere, which included appropriate

communication with customers, clients, coworkers and management. (Pl. Ex. 19.) Because Plaintiff

had not consistently met those expectations, she was being terminated. (*Id.*)

## III. ANALYSIS

The Family and Medical Leave Act (FMLA) prohibits discrimination by employers against

employees who use FMLA leave. 29 U.S.C. § 2615(a)(2); *Bryant v. Dollar Gen. Corp.*, 538 F.3d

394, 401 (6th Cir. 2008). The Sixth Circuit Court of Appeals has interpreted the FMLA as

prohibiting an employer from retaliating against an employee for taking FMLA-guaranteed leave.

*Id.* at 398. The Code of Federal Regulations (CFR) prohibits employers "from discriminating or

retaliating against an employee or prospective employee for having exercised or attempted to

exercise FMLA rights." 29 C.F.R. § 820.220(c). "[E]mployers cannot use the taking of FMLA

leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."

*Id. See also Hunter v. Valley View Local Sch.*, 579 F.3d 688, 690-691 (6th Cir. 2009).

> Any "right" to take unpaid leave would be utterly meaningless if the statute's bar
> against discrimination failed to prohibit employers from considering an employee's
> FMLA leave as a negative factor in employment decisions. Interpreting §
> 2615(a)(2)'s ban on discrimination in a manner that would permit employers to fire
> employees for exercising FMLA leave would undoubtably run contrary to
> Congress's purpose in passing the FMLA.

*Bryant*, 538 F.3d at 401.

To establish a prima facie case of discrimination under the FMLA, a plaintiff must show (1)

he or she engaged in a statutorily protected activity, (2) he or she suffered an adverse employment

action, and (3) a causal connection between the protected activity and the adverse employment

action. *Daughtery v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (citing *Bryson v. Regis

Corp.*, 498 F.3d 561, 570 (6th Cir. 2007)). A plaintiff may establish a FMLA retaliation claim by

either direct or circumstantial evidence. *Id. See also Summerville v. Esco Co. Ltd. P'ship*, 52

F.Supp.2d 804, 808-809 (W.D. Mich. 1999) (Quist, J.) (identifying three ways a plaintiff may establish a prima facie case of discrimination under the FMLA: "by direct evidence of discriminatory intent; by circumstantial evidence of discriminatory intent through the use of the paradigm postulated in *McDonnell Douglas*; or by establishing a pattern of discrimination through the use of statistical evidence" (citations omitted)). Direct evidence of discrimination establishes that the employer was predisposed to discriminate on the basis of FMLA rights and acted on that predisposition. *Daughtery*, 544 F.3d at 707 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). Direct evidence, if believed, requires a conclusion that unlawful discrimination was at least a motivating factor in the employer's conduct. *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005).

When a plaintiff presents evidence of a prima facie case using circumstantial evidence, courts apply the *McDonnell Douglas*[6] burden shifting analysis. *Bryson*, 498 F.3d at 570; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Initially, the plaintiff must present evidence "from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Bryson*, 498 F.3d at 570 (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007)). The plaintiff's burden in presenting a prima facie case is not an "onerous one." *Id.* at 571 (quoting *Skrjanc*, 272 F.3d at 315). *See also Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the prima facie stage is minimal. . . ."). The Sixth Circuit has held the "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson,* 498 F.3d at 571 (citing *Skrjanc,* 272 F.3d at

---

[6]

*McDonnell Douglas Corp. v. Green.* 411 U.S. 792 (1973).

315 and *Chandler v. Specialty Tires of America*, 283 F.3d 818, 826 (6th Cir. 2002)). In most situations, proximity in time, standing alone, will not be sufficient to raise an inference of causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 565-567 (6th Cir. 2000) (collecting and discussing cases on this point). *See also Hout v. City of Mansfield*, 550 F.Supp.2d 701, 730-731 (N.D. Ohio 2008) (Wells, J.) (discussing temporal proximity as evidence of causation and collecting Sixth Circuit cases on both sides of the question of whether temporal proximity, standing alone, can be sufficient to establish the causation element in an employment discrimination case.).

If the plaintiff satisfies the elements of a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Bryson*, 498 F.3d at 570 (citing *Macy*, 484 F.3d at 364). If the defendant produces such evidence, the burden shifts back to the plaintiff to show that the reason proffered by the defendant is a pretext for unlawful discrimination. *Id.* (citing *Macy*, 484 F.3d at 364). A plaintiff can demonstrate the proffered reason is pretextual any of three ways: (1) showing the proffered reason was false; (2) showing the proffered reason was insufficient to cause the adverse action; or (3) showing the proffered reason was not the actual reason for termination. *Joostberns v. United Parcel Servs., Inc.*, 166 F.App'x 783, 794 (6th Cir. 2006) (citing *Manzer v. Diamond Shamrock Chems. Inc.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Although the burden of production shifts between the parties, the burden of persuading the trier of fact that the defendant impermissibly discriminated against the plaintiff remains at all times with the plaintiff. *Bryson*, 498 F.3d at 570 (quoting *Macy*, 484 F.3d at 364 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).

A. Plaintiff's Prima Facie Case

Plaintiff relies on circumstantial rather than direct evidence to establish her case of

discrimination under the FMLA. The first two of the three elements of a prima facie case are not at issue. Plaintiff took FMLA leave, a protected activity. Plaintiff suffered an adverse employment action when she was terminated. The dispute centers over the third element of a prima facie case, the causal connection between the protected activity and the adverse employment action.

Plaintiff presents no evidence that either of the two individuals who made the decision to terminate her, Ballentyne and Walters, were concerned about, or otherwise hostile to, Plaintiff's use of FMLA leave. Plaintiff insists Dykstra expressed concern about her use of FMLA, as evidenced by his emails on August 28 and September 12. Neither document gives rise to an inference of discrimination. First, Dykstra was not involved in the decision to terminate Plaintiff. Second, Plaintiff's interpretation of the two emails is strained. The August 28 email exchange between Dykstra and Surma raises concerns about how Plaintiff's attendance is affecting her caseload. (Pl. Ex. 10.) Dykstra mentions only sick days and vacation days. Surma, in response, merely summarizes Plaintiff's use of sick leave and FMLA leave but explicitly speaks to non-FMLA medical issues. Dykstra's reference to FMLA leave in the September 12 email (Def. Ex. 21) is solitary and in passing. Dykstra explains he called the meeting with Plaintiff in order to review his expectations, as the new supervisor for the Workers' Compensation group, for the unit. His expectations had been "repeatedly shared in day to day interaction with my staff since the 16th of August. Because of Linda's vacation days, sick days, remote access and FMLA leave since 8/16/07 we thought it prudent to review the expectations . . . with her personally and formally in a meeting forum upon her return." (*Id.*)

Plaintiff has satisfied the causation element of her prima facie case. Plaintiff's evidence on the third element, the causal connection between her use of FMLA leave and her termination, is

limited to the temporal proximity between the two events. After Plaintiff met with Ballentyne on September 25, she took several days of FMLA leave. When she returned to work the following Monday, she was informed of her termination. The acute proximity in time between these two events is sufficient to satisfy Plaintiff's initial burden. *See DiCarlo*, 358 F.3d at 421 ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.").

Defendant argues Plaintiff cannot insulate herself from an anticipated adverse employment action by engaging in a protected activity after a chain of events leading to the adverse employment action had been initiated. Various courts have held that when an employee's performance problems precede the employee's protected conduct, the causal connection between the adverse employment action and the protected conduct is tenuous. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their preceding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality."); *Hervey v. County of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) ("'Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.'" (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)); *Mason v. Sash & Door Co.*, 26 F.App'x 531, 535 (6th Cir. 2002) ("Mason failed to establish a causal connection between protected activity and the adverse employment action because the evidence showed Mason knew his position was in jeopardy several months before Mason wrote his March 5 letter accusing Huttig of age discrimination."). Just as Defendant had concerns about Plaintiff's

performance for some time, Plaintiff had been approved for, and had been using, FMLA leave for some time. This is not a situation where Plaintiff, anticipating the worst, suddenly decides to insulate herself by performing some conduct constituting a protected activity.

Because Plaintiff has presented a prima facie case, the burden shifts to Defendant to show a legitimate, non-discriminatory reason for its conduct. Defendant's proffered reason, that Plaintiff was discharged because of her performance related problems including her poor interactions with customer and with her supervisors, is a legitimate justification for the decision to terminate Plaintiff. Walters testified Plaintiff's conduct at the meeting with Ballentyne reinforced the documented history of performance related concerns and led her to the conclusion that it was time to let Plaintiff go. (Walters Dep., 13-14.)

The burden shifts back to Plaintiff to establish this reason is a pretext for discrimination. Plaintiff can demonstrate the reason is pretextual by showing the employer's justification is (1) false, (2) insufficient to motivate her termination, or (3) did not actually motivate her termination. Plaintiff has not established the employer's justification was false. Defendant raised concerns about Plaintiff's performance at least by July 2006. Although Plaintiff's 2007 PRD states she made some improvements under the First Principal, her score under the First Principal fell from the previous year. Plaintiff points to a number of documents showing she made some improvements and other documents praising her abilities. That evidence establishes Plaintiff was aware of the problem and was competent in many areas. The evidence does not establish the specific reason Plaintiff was terminated was false. She may well have shown improvement, but she was also subject to continual monitoring and complaints still occurred. (PRD 2007.)

Neither has Plaintiff demonstrated the proffered reason was insufficient to motivate her

termination.  Plaintiff asserts other claims adjusters took FMLA leave, got behind in their work, were placed in Performance Improvement Plans, and were not terminated. The fact that other workers were not terminated would seem to raise an inference favoring Defendant rather than Plaintiff.  Plaintiff has not shown either employee exhibited similar disruptive behavior or were the subject of numerous complaints.

Finally, Plaintiff has not demonstrated the proffered reason was not the actual reason she was terminated.  In order to establish pretext under this third approach, Plaintiff cannot rely on this same evidence of temporal proximity, but must introduce some additional evidence of discrimination. *See Manzer*, 29 F.3d at 1084.  *See also Skrjanc*, 272 F.3d at 317 ("But such temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.").  On this point, Plaintiff asserts her conduct at the meeting could not have caused her termination because Ballentyne did not intend to terminate her after the September 25 meeting.  Walters testified the decision to terminate Plaintiff was made when she and Ballentyne met later in the day after the meeting.  Ballentyne testified he agreed with the decision to terminate Plaintiff after learning more about Plaintiff's history of performance related problems from Walters.  Plaintiff further asserts she did nothing after the meeting to warrant her termination and there were no documented customer complaints about her after the meeting.  Defendant has never suggested Plaintiff did something after the meeting or that a customer complained after the meeting.  After reading the email summary of the meeting, Walters initiated a meeting with Ballentyne and the two decided it was time to terminate Plaintiff.

Finally, in one additional attempt to establish pretext, Plaintiff argues the testimony offered by Ballentyne and Walters is internally inconsistent, which gives rise to an inference that the reason

proffered was not their actual reason for terminating her. Plaintiff asserts Ballentyne first testified that Plaintiff's conduct during the meeting did not justify her termination and later testified that it was her conduct in the meeting that caused her termination. Plaintiff mischaracterizes Ballentyne's testimony. When asked whether Plaintiff "engage[d] in any behavior on September 25, 2007 that warranted her termination?", Ballentyne testified "I don't recall." (Ballentyne Dep., 11.) Later, Ballentyne is again asked "are you aware of any behavior of Linda Housholder during the meeting of September 25, 2007 that would have justified the termination of her employment?", to which Ballentyne replies "I'm a little confused what you mean by 'justified.'" (*Id.*, 13.) The question is clarified as "would have been grounds in your eyes to terminate her employment." (*Id.*) Ballentyne replies "no." (*Id.*) Ballentyne's testimonial responses are not internally inconsistent. Plaintiff did not engage in any behavior in the September 25 meeting that would have been just cause for her termination. That statement is not inconsistent with Ballentyne's explanation that after he talked with Walters and learned more about Plaintiff's performance history, of which he was unaware at the time of the meeting, the decision was made to terminate her.

Similarly, Walters deposition testimony is not internally inconsistent. Plaintiff asserts Walters first testified that she merely approved the request to terminate Plaintiff and then testified she made the decision on her own, she did not approve a request.

> Q. Were you involved in the decision to terminate Linda Housholder's employment?
> A. Yes.
> Q. What was your involvement?
> A. As the HR vice president, my job is to give final approval, and that's what I did.
> Q. Can an employee be terminated by Hastings Mutual without your approval?
> A. No.
> Q. Who requested approval from you to terminate Linda Housholder?
> A. Obviously the unit supervisor and manager, and their functional vice president, Chris Ballentyne, took that into consideration, but I made the final go-ahead.
> Q. So, Robert Dykstra, Peggy Surma, and Chris Ballentyne came to you with a

decision that they wanted to terminate Linda and sought your approval? Is that how it happened?

A. No.

Q. How did it happen?

A. Chris Ballentyne had a meeting with Linda in the morning of - whatever the morning date was. As practice, I followed up with Chris after he sent me an e-mail with documentation of what that meeting was. Chris and I met. We mutually agreed that there is nothing more we thought that was going to change Linda's behavior, and so after several months of trying to work with Linda, we both said enough is enough. And I said, okay, let's terminate the employment relationship.

(Walters Dep., 10-11.) When the question is asked how a termination occurs, Walters explains that typically she approves requests. When asked who made the request to approve Plaintiff's termination, Walters identifies the individuals in the chain of command. When asked if specific individuals in that chain of command sought her approval to terminate Plaintiff, Walters testifies that was not how this decision was made. In this situation, she and Ballentyne made the decision together.

Even if Plaintiff is correct that there is some ambiguity in Walters' answers, Plaintiff has not created a genuine issue of material fact on the issue of pretext sufficient to present the case to a jury. The factual question needing decision would be who the decision makers were. Plaintiff has still not presented any evidence that anyone at Hastings Mutual was concerned about, or hostile to, her use of FMLA leave. As was explained above, Dykstra's and Surma's references to Plaintiff's use of FMLA leave were innocent and it is clear neither made the decision to terminate. Not every use of the four letters "FMLA" by a supervisor gives rise to an inference of discrimination. The fact that the Human Resources department tracks FMLA leave does not establish that it does so for insidious reasons. Simply put, beyond the temporal proximity between her use of FMLA leave and her termination, Plaintiff has no causal or correlative evidence suggesting any connection between the two events. The record certainly does not establish the "additional evidence" required by Manzer

20

to satisfy the only prong for pretext which could possibly lie in this case. A mere belief that the two events are related is not evidence of pretext and not sufficient to survive a motion for summary judgment.

With the conclusion that Defendant's reasons for terminating Plaintiff were legitimate and not pretextual, this court need not resolve whether Plaintiff committed resume fraud.

## IV. CONCLUSION

Defendant Hastings Mutual Insurance Company is entitled to summary judgment on Plaintiff's claim for discrimination under the FMLA. Plaintiff established a prima facie case of discrimination based solely on the acute temporal proximity between her use of FMLA leave and her termination. Defendant offered a legitimate, non-discriminatory reason for Plaintiff's termination. Defendant justified Plaintiff's termination on her job performance, and specifically on her demeanor interacting with supervisors and customers. Plaintiff has not established that Defendant's proffered reason is a mere pretext for discrimination.

## ORDER

For the reasons provided in the accompanying opinion, Defendant Hastings Mutual Insurance Company's motion (Dkt. No. 37) for summary judgment is **GRANTED.** This order resolves all pending claims in the action. **IT IS SO ORDERED.**

Date:   December 15, 2009                                  /s/ Paul L. Maloney
                                                            Paul L. Maloney
                                                            Chief United States District Judge